### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DUKE EDWARD WILSON,**<br><br>**Defendant.** | **1:21-cr-00345-RCL** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. A consideration of sentencing factors under 18 U.S.C. § 3553 indicates that a sentence within the Guidelines range—41-51 months—is an appropriate sentence here. The Court should impose sentence at the sentencing hearing, but it should set a date within 90 days for a "final determination" for mandatory restitution under 18 U.S.C. § 3663A for losses suffered by the victim of the defendant's criminal conduct. *See* 18 U.S.C. § 3664(a)(5).

### I.    Introduction

On January 6, 2021, the defendant, Duke Edward Wilson (Wilson) participated in a violent attack on the U.S. Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Wilson left his home in Nampa, Idaho on January 5th, 2021, destined for the "Stop the Steal" rally in Washington D.C. on January 6. After attending the rally, Wilson walked the approximately 1.7 miles from the White House Ellipse, where the rally was held, to the U.S. Capitol, where he waded through the crowds and engaged in several acts of violence against police

officers in the Lower West Terrace entrance area.   These acts of violence included punching

them, attempting to take their shields, and throwing objects at them.   Wilson has accepted

responsibility through his guilty plea, and the government recommends that the Court sentence

Wilson to 46 months imprisonment, the middle of the guideline range, as calculated in the PSR.

PSR at ¶ 82.

### Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

On January 6, 2021, Wilson, and hundreds of others, engaged in a violent effort to prevent

the counting of the Electoral College votes and disrupt the peaceful transfer of power, an integral

process of democracy, after the November 3, 2020 Presidential election.   Wilson was among the

first to physically engage officers protecting the entrance of the Capitol in the Lower West Terrace

area.   He, along with dozens of others in the vicinity, attacked officers by punching, kicking,

pulling down their shields and helmets, and striking them with whatever objects they could find

within arm's reach.    Although the facts and the circumstances surrounding the actions of each

rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and

contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the PSR and the Statement of Offense incorporated into Wilson's plea

agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S.

Capitol.   Members of the House of Representatives and the Senate were meeting to certify the

vote count of the Electoral College of the November 3, 2020 Presidential election.   By

approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a

particular objection.   Vice President Mike Pence was present and presiding, first in the joint

session, and then in the Senate chamber.

As the proceedings continued, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals unlawfully forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd unlawfully forced entry, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.   All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   *See* Statement of Offense; PSR at ¶¶ 10-19.

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of

violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.   Exhibit 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Exhibit 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way

into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of

objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the

7

lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers

and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million.

*Wilson's Role in the January 6, 2021, Attack on the Capitol*

Wilson traveled from his home in Nampa, Idaho to Washington D.C., leaving on January 5th, to attend the "Stop the Steal" rally being held near the White House.  From there, Wilson made his way to the U.S. Capitol and attempted to gain entrance into the building through the doors at the Lower West Terrace.  Dozens of officers in riot gear were protecting the entrance to the Capitol building, and upon seeing the mob approaching, officers attempted to close and lock

the doors.   Before they could do so, however, Wilson lunged toward the door and prevented it from closing, allowing other rioters help pry it open and engage officers in the attack, as can be seen in Gov. Exhibit #2 (below):



*Exhibit 2*

Soon thereafter, dozens of individuals, including Wilson, physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.   Officers responded, in part, by spraying the crowd of rioters with chemical irritant in an effort to force them to leave the Lower West Terrace area.   Wilson used the tablet he was carrying to shield his face from the spray (Exhibit #3), but was ultimately unsuccessful (Exhibit #4).



*Exhibit 3*



*Exhibit 4*

Undeterred, Wilson picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at the officers with it, striking A.G., as charged in Count 3 of the Indictment. (Exhibit #5). After assaulting A.G. with the thin PVC pipe, Wilson threw it into the crowd of officers, striking W.B. (Exhibit #6 & Figure #1).



*Exhibit 5 - Wilson hitting A.G.*



*Exhibit 6- Wilson throwing PVC pipe into the line of law enforcement*



*Figure 1 – view of Wilson throwing the PVC pipe into the crowd of law enforcement from W.B.'s body worn camera*

Next, another rioter yelled, "Send the shield back, send the shield back" and "Take the goddamn shield," at which point Wilson, along with other rioters, pushed P.N. to the ground and attempted to take his riot shield.

Ultimately, Wilson spent approximately 14 minutes in the Lower West Terrace tunnel. According to Wilson, he finally left the Capitol area when "some military looking people" dispersed the crowd in the area he was standing with tear gas.   While it is difficult to pinpoint exactly when this occurred based on the defendant's recollections, the fighting in the Lower West Terrace began around 2:40 pm, and the crowd was dispersed with tear gas shortly before 6:00 pm, .

Upon returning home to Idaho, a friend showed Wilson an FBI wanted poster, labeled "AFO-87," with his picture.   Wilson then contacted an attorney and indicated he wanted to

cooperate with the investigation.   That attorney called the local FBI field office and identified Wilson as "AFO-87."

*The Charges and Plea Agreement*

On April 13, 2021, Wilson was charged by complaint with violating 18 U.S.C. § 111(a)(1); 18 U.S.C. § 231(a)(3); 18 U.S.C. §§ 1752(a)(1) and (2); 18 U.S.C. § 1512(c)(2); and 40 U.S.C. §§ 5104(e)(2)(D) & (G).   On April 16, 2021, he self-surrendered to the Ada (Idaho) Sheriff's Department.   On May 7, 2021, a federal grand jury returned an eleven-count indictment against Wilson, charging him with the same offenses, which included three counts of 18 U.S.C. § 111(a)(1).   On September 7, 2021, Wilson entered a guilty plea to Count 3 (18 U.S.C. § 111(a)(1)) and Count 7 (18 U.S.C. § 1512(c)(2)) of the indictment.

## II.      Statutory Penalties

As noted by the plea agreement and the U.S. Probation Office, a violation of 18 USC § 111(a)(1) carries a maximum sentence of 8 years of imprisonment; a fine not to exceed $250,000; and a term of supervised release of not more than 3 years.   A violation of 18 U.S.C. § 1512(c)(2) carries a maximum sentence of 20 years of imprisonment; a fine not to exceed $250,000; and a term of supervised release of not more than 3 years.

## III.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.

*Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The Government has one objection to the PSR.   The PSR does not include a Guidelines analysis for both Counts—Counts Three and Seven—to which the defendant pleaded guilty. *See* PSR ¶¶ 24-40. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 28) that Counts Three and Seven group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

Count Seven: 18 U.S.C. § 1512(c)(2)

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[1] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |

---

[1] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[2] The term "substantial interference with the administration of justice" as defined in the

16

|  |  | **Total** | **25** |
|---|---|---|---|

Count Three: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level |  | 14 |
|---|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim |  | +6[4] |
|  |  | **Total** | **20[5]** |

| **Combined Offense Level** |  | **25** |
|---|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) |  | -3 |
| **Total Adjusted Offense Level:** |  | **22** |

*See* PSR at ¶¶ 30-40.

The parties agree, and the U.S. Probation Office recommends, that a three-level upward adjustment applies under U.S.S.G. § 2J1.2(b)(2) because "the offense resulted in substantial interference with the administration of justice."  Wilson admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count.  He did so by attempting to unlawfully entering the U.S. Capitol alongside hundreds of other rioters with whom he shared in a unified goal:  to block Congress from completing the certification.

---

commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Fairlamb admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and nearly $1.5 million in property destruction. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[4] The plea agreement erroneously included a three-level enhancement for physical contact under § 2A2.4(b)(1).  Because the applicable Guideline is § 2A2.2, the enhancement under § 2A2.4 does not apply.

[5] The PSR correctly concludes that the specific thin pipe used by the defendant is not a dangerous weapon for the purposes of §2A2.2(b)(2).  *See* §1B1.1 app. n.1(E) (defining dangerous weapon).

17

Defendant's obstructive conduct took place amidst a violent riot that engulfed the entire Capitol. The riot resulted in evacuations, vote count delays, officer injuries, and over $1.4 million in property destruction.   Ultimately, the rioters' conduct literally stopped the official proceeding in its tracks.   This constituted an even greater interference and intrusion than the examples of serious disruptions listed in the commentary regarding the application of this enhancement.   *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1 ("a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources"). One need only imagine a judicial proceeding underway in a courthouse surrounded and breached by rioters, intent on halting a trial, to appreciate that the interference on January 6 was substantial by any measure.

The parties also agreed that pursuant to USSG § 2J1.2(b)(1)(B), an increase of 8 levels is appropriate because the offense involved causing or threatening to cause physical injury to a person. As part of Wilson's effort to storm the Capitol building and stop certification of the Electoral College vote count, he caused or threatened to cause injury to officers protecting the Lower West Terrance entrance.   As shown above, Wilson engaged a number of officers in physical altercations, including pushing them and striking them with a thin PVC pipe.

The U.S. Probation Office correctly calculated Wilson's criminal history as a category I. PSR at ¶ 45.   Accordingly, the U.S. Probation Office calculated Wilson's total adjusted offense level, after acceptance, at 22, and his corresponding Guidelines imprisonment range at 41-51 months.   PSR at ¶¶ 40, 82.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.   Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   The purposes of sentencing, pursuant to § 3553(a)(2), are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Section 3553(a) factors include the following:   (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," *id*.; (3) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (4) "deterrence," 18 U.S.C. § 3553 (a) (2)(B); (5) the Guidelines and Guideline range, 18 U.S.C. § 3553(a)(4); and (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).

Of course, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 39; *Nelson v. United States*, 555 U.S. 350, 352 (2009).   Examination of the Section 3553(a) factors, however, shows that a Guidelines sentence is appropriate in this case.   Moreover, a sentence at the mid-point of the Guidelines range is warranted.

## A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the

only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

On January 6, 2021, Wilson purposefully joined a large group of rioters intent on interfering with the nation's electoral process.   In doing so, Wilson and others not only imperiled

core democratic functions, but also collectively caused enormous emotional, physical, and financial injuries along the way.

As set forth in the Statement of Offense, Wilson and the other rioters successfully shut down the certification of the electoral vote count for several hours, as members of Congress and their staff were forced to take shelter from the violence.   As noted above, the rioters injured over a hundred law enforcement officers and terrified individuals on scene that day, leaving significant emotional scars, as well as causing over $1.4 million in property damage.   This number understates the extent of the property damage, as it does not include the irreparable and unquantifiable damage to artwork, statues, and other artifacts that were stolen or damaged.

Wilson was no minor participant or bystander in the effort to overrun the Capitol and stop the Electoral College vote certification. Wilson was one of the first individuals to engage officers in the Lower West Terrace area.   Importantly, as officers were attempting to close the doors and seal off the entrance, Wilson lunged and grabbed the door just as it was being closed, giving time for other rioters to come to his aid and pry the door open the rest of the way.   Had those doors been allowed to close, the melee that ensued may well have never taken place.   Wilson attacked, to varying degrees, at least three police officers protecting the entrance, using whatever means he had available to him, whether that was his hands, or construction equipment he found on the ground.   Those officers suffered injuries as a result of the Capitol Riot, including injuries to A.G.'s feet and shoulders, among other things. As discussed below, it remains to be determined the full scope the Officer A.G.'s losses and the extent to which Wilson bears responsibility for those losses.

At any moment – from the time he started making the 1.7 mile walk from the Ellipse to the time he found himself face-to-face with a line of officers dressed in full riot gear and spraying him

with OC spray – Wilson could have turned around and left the area.   Instead, he kept going.
While the Government cannot say whether Wilson came to Washington DC with the intent to
commit violence, the facts are clear that when presented with the opportunity for violence, he
repeatedly took it.

**B.**     **The History and Characteristics of the Defendant**

As set forth in the PSR, Wilson has two DWI convictions, in 1999 and 2010, respectively.
Wilsonhas had stable employment and is now retired.   Since the time of his arrest, he has complied
with his conditions of release.   Wilson is also one of the first defendants to plead guilty to
assaulting federal officers on January 6, 2021.   Only Scott Fairlamb, case number 21-cr-120, and
Devlyn Thompson, case number 21-cr-461 pleaded guilty earlier than Wilson's September 8, 2021
plea date.   He is to be credited for his remarkably early acceptance of responsibility.

**C.**     **Respect for the Law**

Wilson's criminal conduct, the corrupt obstruction of an official proceeding, is the epitome
of disrespect for the law.   "The violence and destruction of property at the U.S. Capitol on January
6 showed a blatant and appalling disregard for our institutions of government and the orderly
administration of the democratic process."[6]   Law enforcement officers were overwhelmed,
outnumbered, and in some cases, in serious danger.   The rule of law was not only disrespected, it
was under attack.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for
a serious offense threatens to promote disrespect for the law").

---

[6]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House
Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"),
available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20
Testimony.pdf

D.      **Deterrence**

General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[1] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on

23

January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although the defendant has now expressed remorse and contrition, the Court should hold him accountable for his violent behavior. As officers were attempting to seal off the entrance to the Lower West Terrace by closing the doors, Wilson lunged forward and grabbed the door, allowing time for other rioters to come to his aid.   Had Wilson not prevented the doors from closing, at a minimum, officers may have had more time to prepare themselves to battle with the crowd, or even possibly deterred the crowd from attempting to breach the doors altogether.   Second, Wilson's violence was indiscriminate.   He physically engaged with officers in the Lower West Terrace at every opportunity and using any means at his disposal, whether that was by using his fists, objects laying on the ground, or attempting to strip away the officers' protective shield.

### E.   The Importance of the Guidelines

The advisory Guidelines range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor.   "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   *Gall*, 552 U.S. at 50, n.6.   Indeed, "the sentencing court must first calculate the Guidelines range, and then

consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the [Guidelines range] with reference to the latter." *Nelson*, 555 U.S. at 350.

Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.

Third, Congress is the ultimate maker of sentencing policy, *Mistretta v. United States*, 488 U.S. 361, 363 (1989); *Dorszynski v. United States*, 418 U.S. 424 (1974); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 94 (1820), and the Guidelines reflect the views of Congress through its instructions to the Commission, the Commission's effort to "establish a sentencing range that is consistent with all pertinent provisions of Title 18," Congress's review of all Guidelines before they take effect, and Congress's direct input into certain Guidelines.   *See, e.g.*, 28 U.S.C. §§ 991(b), 994(b)(1), (h)-(l), (p).   Members of the federal judiciary also had input into the Guidelines directly as Commission members and commentators and indirectly through the Commission's ongoing and "careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."   *Gall*, 552 U.S. at 46; 28 U.S.C. § 994(o)-(p).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita*, 551

U.S. at 349.   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one."   *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6) – the need to avoid unwarranted sentencing disparities – the crimes that Wilson and others like him committed on January 6 are unprecedented.   Indeed, there has never been a § 1512 case in history that begins to approach the magnitude, importance and historical consequence of the January 6 riot. Moreover, Wilson's personal responsibility exceeds that of most other rioters.   Wilson played a large part in allowing the violence in the Lower West Terrace to occur by preventing the doors from closing, and he personally engaged in acts of violence against at least 3 different officers, attempting to strip one of his protective shield and striking two others with a PVC pipe.   This level of violent engagement does not argue for a sentence at the bottom of the guidelines, let alone a sentence below the guidelines.

To put Wilson's conduct into context, it is helpful to examine three similarly situated defendants.  On November 10, 2021, this Court sentenced Scott Fairlamb, a New Jersey gym owner and MMA fighter, to 41 months imprisonment.   Fairlamb was part of a group of rioters who broke through a police line in the Upper West Terrace area and forced their way into the Capitol.   After leaving the Capitol, Fairlamb offered an officer water and told others in the crowd to leave the officers alone.   However, approximately 20 minutes later, Fairlamb began harassing a line of MPD officers who were attempting to make their way through the thick crowd of rioters

to join a larger group of officers, shoving and punching one in the face.   The officer suffered no injuries.   Although he expressed remorse at his sentencing hearing, Fairlamb made several social media posts shortly after January 6, showing little remorse, and even saying "I'd do it again."

Similarly, Jacob Chansley was sentenced by this Court on November 17, 2021 to 41 months in prison.   Chansley used his social media presence to spread false information and rhetoric that led many rioters to the Capitol on January 6, and helped to agitate the crowd.   He was among the first to enter entered the Capitol and eventually found his way to the Senate floor, where he sat where the Vice President sat just an hour before.   Like Fairlamb, Chansley loudly boasted of his activities on social media and elsewhere shortly after January 6.   Chansley did not, however, personally engage in acts of violence.

Lastly, and perhaps most like Wilson, this Court sentenced Devlyn Thompson to 46 months in prison on December 20, 2021.   Devlyn Thompson was among individuals in a crowd on the Lower West Terrace of the Capitol who were pushing against and assaulting officers in the tunnel leading into the Capitol. Thompson and others in the tunnel yelled obscenities at police and encouraged the continued assault. Thompson was part of a group that threw objects and projectiles at the officers, including flag poles, and grabbed and stole the officers' riot shields to prevent them from defending themselves against the violence.

While Wilson may not have entered the Capitol building, as Fairlamb and Chansley did, he was unquestionably more violent.   Fairlamb shoved one officer and threw one punch, whereas Wilson engaged three officers, throwing punches, attempting to take one's shield and indiscriminately throwing a thin PVC pipe into the crowd of officers guarding the entrance. Chansley played a significant role in delaying of the counting of the Electoral College vote but did

not personally engage in physical acts of violence, whereas Wilson engaged multiple officers with whatever means he had available to him. Wilson also did not make inflammatory post-January 6 statements, but it is worth noting that Wilson did not use social media, so the opportunity to make such public statements was limited.   Wilson's violence was more egregious than Fairlamb's and Chansley's, and he was at least as violent as Thompson.   Considering Fairlamb and Chansley's sentences of 41 months, Thompson's sentence of 46 months, and that Wilson's conduct was most similar to Thompson's, a sentence of 46 months would avoid unnecessarily disparate sentences.

### V.       § 3553 Analysis

Taking into account all of these factors, a mid-guidelines sentence is most appropriate in this case.   While the government credits the defendant's efforts to turn himself in and early acceptance of responsibility, it cannot ignore the gravity and weight of this crime. Thus, not only do the Guidelines provide critical context at sentencing, but the remaining factors – the nature and circumstances, § 3553(a)(1); the need to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for adequate deterrence, § 3553(a)(2)(B); and the need to protect the public from further crimes of the defendant, § 3553(a)(2)(C) – all weigh in favor of an 46-month sentence, followed by supervised release.   Such a sentence will accomplish the goals of § 3553(a) and serve as a vital reminder that January 6, 2021, represented a violent threat to the democratic process.   *See Munchel*, 991 F.3d at 1284.

### VI.    __RESTITUTION__

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096.   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.   Both require that restitution "be tied to the loss caused by the offense of conviction."   *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).   Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. [7]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance

---

[7] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.   *See Emor*, 850 F. Supp. 2d at 202.   The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[8]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.   *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, *5 (D.N.J. Jan. 15, 2020).   As relevant to the defendant's case, the sentencing court under the VWPA "may

---

[8] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   *Fair*, 699 F.3d at 513.

also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement."
18 U.S.C. § 3663(a)(3).

Those principles apply in two different ways in this case..   First, the victim in this case,
Officer A.G., suffered bodily injury as a result of Wilson's (and other rioters') assault.   Restitution
to Officer A.G. is therefore mandatory.   *See* 18 U.S.C. § 3663A(c)(1)(B) (restitution mandatory
for "any offense . . . in which an identifiable victim . . . has suffered a physical injury").   But the
full scope the Officer A.G.'s losses as a result of that injury and the extent to which Wilson bears
responsibility for those losses has not yet been determined.   Because those losses are therefore
"not ascertainable" at this time, the Court should set a date for a "final determination of the victim's
losses" within 90 days of the sentencing hearing.   *See* 18 U.S.C. § 3664(a)(5).   The Court may
benefit from additional written submissions from the parties addressing the appropriate restitution
amount under the MVRA.

Second, the parties agreed as permitted under 18 U.S.C. § 3663(a)(3) that Wilson must pay
$2,000 in restitution to the Architect of the Capitol, which reflects in part the role Wilson played
in the riot on January 6. Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the
United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on
loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Wilson's restitution
payment must be made to the Clerk of the Court, who will forward the payment to the Architect
of the Capitol. *See* PSR ¶ 103.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a
sentence of imprisonment of 46 months, which is the mid-point of the Guidelines range as

calculated by the U.S. Probation Office.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    */s/   Christopher Tortorice*
          Christopher Tortorice
          Assistant United States Attorney
          Texas Bar No. 24048912
          555 4th Street, N.W., Rm. 11-449
          Washington, D.C. 20530
          (202) 252-7155
          Christopher.Tortorice@usdoj.gov