1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2    ---------------------------X

3    UNITED STATES OF AMERICA

4              v.              Criminal Case 21-345 (RCL)

5    DUKE EDWARD WILSON,

6              Defendant

7    ---------------------------X
                              Washington, D.C
8                             Friday, March 4, 2022
                              1:55 p.m.
9

         TRANSCRIPT OF A SENTENCING HEARING (REMOTE)
10          BEFORE THE HONORABLE ROYCE C. LAMBERTH
                UNITED STATES DISTRICT JUDGE
11   APPEARANCES:

12   For the Government: Christopher T. Tortorice, AUSA
                         U.S. ATTORNEY'S OFFICE - D.C.
13                       555 4th St NW, Ste 11-449
                         Washington DC, DC 20530
14                       202-252-7155

15   For the Defendant:  Charles Peterson, Esq.
                         PETERSON LAWYERS
16                       671 E Riverpark Lane, Suite 210
                         Boise, ID 83702
17                       208-342-4633

18

19

20

21

22

23   Court Reporter:     Lisa Walker Griffith, RPR
                         U.S. District Courthouse, Room 6507
24                       Washington, D.C.  20001
                         (202) 354-3247
25

1 **P R O C E E D I N G S**

2          THE COURTROOM DEPUTY:  We are here for sentencing in

3 criminal case 21-345, United States of America versus Duke

4 Edward Wilson.

5          Counsel, please state your names for the record,

6 starting with the government.

7          MR. TORTORICE:  Good afternoon, Your Honor.  Chris

8 Tortorice for the government and the government is ready to

9 proceed.

10          THE COURT:  All right.

11          MR. PETERSON:  Good afternoon, Your Honor.  Charles

12 Peterson for the defendant who is present with me in my

13 office.

14          THE COURT:  Okay.  Mr. Wilson, can you hear me okay?

15          THE DEFENDANT:  Yes.

16          THE COURT:  I take it there is no dispute over the

17 final presentence report.  Both sides are satisfied with the

18 final presentence report?

19          MR. PETERSON:  That is correct.

20          MR. TORTORICE:  Yes, Your Honor.

21          THE COURT:  All right.  Under the final presentence

22 report, the federal guideline provisions are total offense

23 level of 22, criminal history category one with custody of 41

24 to 51 months.  Supervised release one to three years,

25 ineligible for probation.  Fine range would be $15,000 to

1    $150,000.  Restitution is 2,000.  Special assessment $200

2    required to be imposed by statute.

3          There is a motion for a downward variance filed by

4    the defendant.  Have you all talked about who is going to go

5    first in allocution since there is a motion?

6          Okay, does government have a preference on whether

7    the defendant goes first since he has motion for --

8          MR. TORTORICE:  (Inaudible)

9          THE COURT:  Go ahead, Mr. Peterson.

10          MR. PETERSON:  Thank you, Your Honor.

11          I want to begin today by just expressing on behalf

12    of my client how we appreciate that you gave us some

13    additional time to prepare for this hearing.  This is a case

14    in which, as you know, this is one of the January 6th cases.

15    You have undoubtedly far more experience and knowledge about

16    what happened on that day than I do or than Mr. Wilson does

17    or likely anyone else.  We know that you've been involved in

18    sentencing these cases already.

19          This morning, I happened to hear William Barr

20    talking on the news about his interactions on December 1st

21    with the president.  And it struck me, as I listened to him,

22    that he had this conversation with the president where he was

23    explaining to the president that he could not go forward with

24    this idea that this election had been stolen because it would

25    prompt action by people outside.  And the result of that, as

1  you probably know, is that the president essentially fired

2  him, he resigned.

3       Mr. Barr gave the president good reason why he

4  should not go forward with this lie, this stop the steal lie.

5  And it had largely to do with the fact that the Department of

6  Justice had investigated the claims, had investigated the

7  legal theories and had come to the conclusion that they were

8  not soundly supported in fact or in law.

9       I start there because I want you to understand with

10  respect to Mr. Wilson, he believed from the beginning in this

11  president.  Supported him fully.  He believed that in fact

12  the president was telling the truth, that the election had

13  been stolen.  Whether rightly or wrongly, that was the system

14  of beliefs that he had when he traveled from his home here in

15  rural Idaho to Washington, D.C.

16       What he is going to tell you today is that that was

17  not his first presidential rally.  I pointed out in his

18  memorandum that this is a man who grew up in a small logging

19  community.  He worked as a logger.  And at some point, he was

20  in Oklahoma working on the pipeline, and he had attended a

21  Trump rally while he was working at the pipeline.  Had

22  attended another Trump rally earlier in December.  And he'll

23  tell you about those rallies and those incidents.

24       But the general theme that I would convey to you is

25  simply this.  He believed those things.  When he went from

1    Idaho to Washington, D.C., he didn't go intending to violate

2    the law, he only went intending to support the president.

3         He leaves from the rally along with the others after

4    the president has advised that they're going to the Capitol.

5    He gets in with the crowd of folks and travels to the

6    Capitol, he walks there with his son.  He ultimately ends up,

7    as he says in his statement that was provided in the

8    sentencing, he ultimately ends up there inside that tunnel,

9    what we've described as the lower wing tunnel of the west

10   entrance.

11        He is in there and he is watching what is going on

12   around him.  At some level, the initial question which Duke

13   has to answer is simply why he is there, how is it that he is

14   involved in this mess.  Because, as you know, we pointed out

15   he has a criminal history category one.  He is someone who

16   doesn't have any lengthy criminal history at all.  He is 68

17   years old at this point.  He has lived a life that has been

18   productive and has been community involved.

19        I submitted statements, you likely saw, on behalf of

20   him, written by folks who know him well.  They say he is a

21   man of integrity, a man who can be trusted.  He has trained

22   up young people in his community and he is somebody who would

23   not generally have been involved in any of this, certainly

24   not a violent person.

25        So what happened?  Well, the first thing that

1  happens in this case, I suspect, is that we can explain most

2  of his behavior largely resulting from the crowd.  He is

3  somebody who has two people in their statements for the Court

4  to say he got caught up in the crowd, got caught up in the

5  moment.

6       And when I look at what happens in a crowd, when you

7  look at cases, when you look at research, there are three or

8  four things that consistently happen within a crowd that

9  cause people to behave in ways that they otherwise wouldn't

10 behave.

11      The first, scientists looking at this stuff talk

12 about crowds being a potential time bomb and that, in

13 essence, the job of the security folks at that point is to

14 try to diffuse the time bomb, not get into a situation where

15 there is a confrontation.

16      THE COURT:  You hit your mute button.

17      MR. PETERSON:  My apologies, Sir.

18      Certainly there is no blame here on the part of the

19 security personnel.  That's not my point. But my point is

20 that, because of this, as he goes to the Capitol, as gets

21 funneled in and is in this tunnel, he looks around him.

22 There are supposedly five things that happen that scientists

23 say about crowds that cause them to become violence.

24      The first thing literally has to do with watching

25 what's going on around you, the spread of what is called the

1    social contagion, the spread of inappropriate behavior by

2    others.  This sort of explains on some level how you watch

3    other people misbehaving, and ultimately that impacts you and

4    your own behavior, and leads to what wouldn't ordinarily

5    occur and you engage in conduct that, you eventually have to

6    ask yourself later on, how in the world you did such a stupid

7    thing.

8         Anonymity is another thing.  You know Duke was not

9    anonymous by any sense.  He was wearing his cap that said

10   "CNN Fake New." He said in his statement, it was mostly a

11   joke.  But he did believe the president when the president

12   said that what had happened here was not real and not fair

13   and was in fact a fraud on the voters.

14        The third thing that happens in these crowds is that

15   they, if you start with these emotions, the emotional value

16   of the crowd causes people to make bad decisions.  It happens

17   to all of us when we get emotional.  We don't necessarily

18   make the right call.  And that happened with him.

19        The third thing that they talk about is the

20   preexisting anxiety before you get into the crowd.  He was in

21   fact anxious about this entire situation.  He wasn't used to

22   being in big crowds.  He had not been in Washington, D.C.

23   except that one time before.  On that occasion, he had been

24   there but didn't get to see any of the sites because of

25   COVID.

1          When I look at Duke Wilson, the reason I ask for a

2     variance in this case has to do with the fact that his

3     behavior on this occasion is aberrant behavior, completely

4     outside his norm.  It was the behavior of somebody who was

5     wrapped up in his belief that the election had been stolen,

6     as he says, his desire to support the president.  He didn't

7     come back intending to become engaged in any sort of riot or

8     bad conduct at all.

9          Now, I've watched the videos.  And I can certainly

10    understand, I'm sure the Court has, I'm sure you have seen

11    far more than I have or will.  But the videos in this case do

12    show Mr. Wilson in a very short period of time, actually I

13    think we've chopped them up into three or four videos.  The

14    reality is a sequence of events that occurs, the United

15    States videos do well showing from the other side.  The

16    videos mostly that we had showed from the side of the people

17    who were there in the tunnel, who are directly opposed at

18    that point to the security personnel.

19         There are a couple of things that I mention in my

20    sentencing memo about behavior there.  First, Mr. Wilson has

21    claimed consistently that he doesn't really have very good

22    recall of what happened because he gets beaten, hit on the

23    head.  One of the videos in particular shows that he has

24    moved in, I think it's a video where he is holding on to the

25    door.  Then he is repeatedly hit.  I counted 8 or 9 times.

1    And he said look, I really don't remember much about what

2    happens at that point.  He says he is ashamed of his

3    behavior.  He admits these things happened but he doesn't

4    have great recall.

5          When I look at his behavior, I'm not going to

6    suggest that it was correct or lawful because that's why he

7    pled guilty.  But I certainly do not think that, in view of

8    everything that happened there, that we should conclude, as

9    the government suggests, that he wasn't being pushed forward.

10         The best evidence of that is in the videos.  There

11   is a man right next to him and a woman next to him at one

12   point, this is the occasion where there's a woman off to the

13   right.  He kind of goes towards the officers off to the

14   right, again with her.  And you see his hat is knocked off.

15   He didn't knock his own hat off.  People are pushing from

16   behind.  When you look at others in the videos, for example,

17   there are two men who appear facing the protesters who appear

18   to be trying to get out, trying get out of there.  But they

19   just simply can't.  Mr. Wilson says that he was doing exactly

20   that.  He wanted to leave but he had been forced forward.

21         Now, that doesn't change the fact that, on at least

22   three occasions, it looks like he grabbed a shield, he

23   grabbed that door, and he went forward and fell into the

24   officers on the floor.  He gets hit again two or three times

25   pretty hard.  Gets up and you see him ultimately leaving.

1          So why is it then, Duke Wilson, with no prior

2     criminal record of violence, well regarded in his community,

3     why is it that he is there, and why is it that he gets into

4     this incredible mess?  Well, he is like so many of the other

5     folks who were there.  I think he went there with the best of

6     intentions.  He didn't go there intending to overthrow the

7     United States government.  He didn't go there intending to go

8     cause a riot or be involved in a riot.

9          You know what is incredibly different I think from

10    those two groups of people is that a lot of those folks go,

11    they are in fact masked, they're wearing camouflage gear.

12    They are members of groups like the Proud Boys, or they are

13    members of the Three Percenters who are militia, any of those

14    things, they wear items that are intended to protect

15    themselves as they go into the Capitol.

16         Duke went into the Capitol with his iPad and kind of

17    a wallet, a long wallet that he is holding in the same hand

18    so that he doesn't lose his stuff, his ID.  He is just

19    dressed like an ordinary person.  He is, for the most part,

20    like everybody else who is not there intending to cause an

21    insurrection or try to take over the United States

22    government.  That's not Duke.

23         His support for the president, his opportunity to

24    travel, for example in this case, is largely opportunistic,

25    it's not really very well planned.  We did an interview with

the FBI and the United States.  He was asked how did you get
there.  He said well, we flew.  Well, where did you fly into?
I don't really know.  Didn't you make your reservations?
Well no, my daughter-in-law made reservations for me and my
boy, Brian.  And we asked him where do you think you flew
into.  And he said, I don't know,  I think it was in
Pennsylvania someplace.  Then he took an Uber down to find a
hotel.  Then from the hotel, he took another Uber the next
day down to the rally.  And he takes an Uber to a different
airport to leave ultimately.

This was not somebody who was involved in planning,
coordinating or directing.  He didn't even plan his own
transportation.  When he goes to the rally, he thinks he's
leaving immediately after the rally.  But somehow, his
daughter-in-law found out a way for them to spend a night in
the hotel and go home the next day.  His behavior is not
intentional in that sense, it is opportunistic.  He said that
he is in this crowd of people.

This morning, as I was watching something on TV, I
was reminded that there were people literally from all 50
states who had attended, buses full of people who went there
intending, probably out of the best intentions, simply to
protest the election.

And there is nothing, there would be nothing wrong
if that's all you did.  The problem is he gets involved in

1    these other inappropriate behaviors that are outside of his

2    norm and behaviors that clearly have a relationship to two

3    things: this notion that the election had been stolen and the

4    crowd dynamics employed that day.

5            With those things in mind, Your Honor, I'm asking

6    you to grant a variance in this case largely because, not

7    only is the behavior aberrant and opportunistic and I suggest

8    crowd-based, but this is just a guy who is a logger from

9    Oregon with an iPad and a wallet who thinks he is going to

10   take pictures and listen to the president speak.  And this is

11   such unusual behavior for him.

12           I would ask you to take into consideration that he

13   is now 68 years of age.  He has complied consistently with

14   what he has been asked to do.  As I suggested in my

15   sentencing memorandum, a just punishment in this case doesn't

16   necessarily have to include a lengthy period of detention.

17   41 to 51 months is the guideline range.  I understand the

18   nature of the guidelines.  I also understand that you begin

19   there.  And I understand how we get to whatever sentence you

20   arrive at.

21           The reason I ask for a variance in part, it's all of

22   that stuff but it's two other things.  First, it's his

23   incredible, frankly I think incredible acceptance of

24   responsibility.  By that, here is what I mean.  Your Honor, I

25   was a Federal Public Defender about a year ago when all this

1    stuff happened.

2          And I was, I took my office and we went out in the

3    afternoon to go skiing here.  And I got this phone call from

4    a lawyer who said, I got these two guys and they're in my

5    office.  They were in Washington, they're worried the FBI is

6    after them.  I said have them call me tomorrow.  And they

7    did.  I said look, we'll do some checking and see if we can

8    find out.  But as far as I know, you are not on anybody's

9    radar that we've been told about.

10          Another person in my office spoke with Mr. Wilson

11   later that day, and said we made contact with the United

12   States to see if they want you to turn yourself in or what

13   they would like to do.  They said essentially just to hold

14   off because, right now, there is nothing that would bring you

15   in.  He was ready to turn himself in, in February.

16          He ultimately turns himself in when asked.  He

17   cooperates fully.  I gave the United States a copy of that

18   statement, gosh, I don't know a month and a half ago, way in

19   advance of us doing the interview with the FBI and with the

20   government.  I wanted them to know what his position was.

21          And his statement, by the way, is not my statement.

22   It was handwritten in a notebook.  He brought me this

23   notebook when I was with the Federal Defenders.  It was his

24   version.  Said he wrote it down early so he would know what

25   he really did, what he really remembered.  That transcript is

1    his statement, not mine.

2         A lot of stuff in there, a lawyer might not have

3    included but he did.  He has been incredibly honest frankly

4    about what he has done and he has taken responsibility.  He

5    will tell you he is sorry about this, that what he did is

6    completely wrong.

7         What I would ask the Court to do in this case is

8    grant a variance below guideline range, not impose a lengthy

9    period of time in confinement or detention.  But instead,

10   impose some period of detention and a period of supervised

11   release.

12        Mr. Wilson is somebody who will never disobey the

13   law again.  He is somebody who has no interest in any of this

14   stuff.  Really he would like to retire, go work with his son

15   on his ranch and, as he said, take care of his cow dog.  So

16   that is who Duke Wilson is and I hope that you will grant him

17   a sentence far below the 41 months.

18            (There was a pause in the proceedings.)

19            THE COURT:  All right.  The government can proceed.

20            MR. TORTORICE:  Thank you, Your Honor.

21        A couple of points.  I don't want to belabor the

22   issues, I think that both sides have presented memos to the

23   Court outlining each side's arguments.  So I don't want to --

24            THE COURT:  Wait a minute.  I may have lost the

25   defendant.  All right.

1          MR. TORTORICE:  I'm obviously not going to rehash

2    everything that is in our sentencing memo.  But a few points

3    worth making.  So the first point I would like to make is the

4    idea that Mr. Wilson didn't come there that day dressed in

5    fatigues or body armor.  These are things we have seen in

6    some cases.  He didn't come with intent to commit these acts.

7    I think that's probably true based on the evidence that I

8    have seen.  I have not seen any evidence that he did come

9    with that intent.

10          But it is worth noting that probably the majority of

11   people that were there that day didn't come with that intent.

12   And the majority of the people that were there that day did

13   not engage in the level of violence and aggression that

14   Mr. Wilson did.  They were all in the same crowd.  They were

15   all, almost all at the same speech beforehand. So the idea

16   that sort of everybody in the crowd was likely to commit

17   these sorts of acts of violence just isn't borne out by what

18   we saw that day.

19          I want to play a few short clips from videos of the

20   scene on the lower west terrace that day in a second.  The

21   Court will be able to see that Mr. Wilson is among one of the

22   most aggressive people in that crowds.

23          So in order to avoid unwarranted sentencing

24   disparities, Mr. Wilson is not unique I guess in the idea

25   that he didn't come with that intent, and maybe whipped into

1    a frenzy.

2            (There was a pause in the proceedings.)

3            MR. TORTORICE:  Another point I think is worth

4    making that it is true, Mr. Wilson pleaded guilty early.  He

5    made himself available to law enforcement, he essentially

6    turned himself in and we're not disputing those elements of

7    his acceptance of responsibility.

8            However, it does seem at least to me, that

9    Mr. Wilson's lack of recollection of what happened in the

10   tunnel sort of belies a little bit of the full acceptance of

11   responsibility.  He seemed to have good recall about what

12   happened before the tunnel and what happened after the

13   tunnel.  And it just seems to be the parts where he is doing

14   the worst things are the parts where he has the foggiest

15   memory.  Whether that is actually the case or not, I don't

16   know.  But I think that does somewhat detract from the idea

17   that it is a full embrace of acceptance of responsibility.

18   But like I said, he did plead guilty early and did turn

19   himself in.  So I think it cuts both ways.

20           With that, Your Honor, I would like to, with the

21   Court's permission share my screen and play some of these

22   videos if that's okay.

23           THE COURT:  You may.

24           MR. TORTORICE:  Can you see that, Your Honor?

25           THE COURT:  Yes.

1          MR. TORTORICE:  Okay.  So the first video is

2     approximately a minute and a half or so long.  What you will

3     see, it is a one minute, 11 seconds long, and at 8 seconds

4     into the video, you will hear someone scream something to the

5     effect of  "open the door."  It is a little hard to make out

6     but you can hear someone suggesting something about opening

7     the door.

8          At that point, Mr. Wilson is sort of two or three

9     people back in the crowd, and then sort of moves forward to

10    grab the doors.  And on 25 seconds, several other people

11    strike an officer with these PVC pipes.  They're fairly thin,

12    an inch and a half PVC pipes that were on the ground in the

13    immediate area.  And then you will see Mr. Wilson at 28

14    seconds strike at the officers.  And at about 39 seconds,

15    sort of toss the PVC pipe back at the officers.

16         One thing I would ask the Court to pay particular

17    attention to, so Mr. Wilson has suggested that he got shoved

18    to the front of the line sort of unwillingly.  I would ask

19    the Court to pay particular attention to whether that seems

20    to be the case or Mr. Wilson seems to be moving towards the

21    front on his own locomotion rather than the inertia from the

22    crowd behind him.

23         You can see before I start the video, I believe this

24    is Mr. Wilson right here in the foreground with the white hat

25    and sort of purplish front.  So I'll play it.

1          (Video played)

2          MR. TORTORICE:  I'll pause it right there.

3          As you can see, the officers are trying to close the

4    door.  And they were prevented from closing the door by

5    primarily Mr. Wilson.  I'm not going to say exclusively

6    Mr. Wilson.  There were a lot of people grabbing at the door.

7    But I would say primarily by Mr. Wilson.  I think there is a

8    decent argument to be made that, had he not done that, the

9    doors to the lower west terrace may have closed and it might

10   have been a very different story.  Whether the crowd would

11   have eventually broken down the doors on their own, I don't

12   know.  But it would have given, at a minimum, given the

13   officers an opportunity to regroup, maybe get some more

14   people down there to help and it might have been a different

15   situation all together.  So let me rewind it here.

16         (Played video)

17         MR. TORTORICE:  Your Honor, it is undoubtedly,

18   obviously a chaotic situation in the lower west terrace

19   tunnel.  But based on my view, and I think an objective view,

20   Mr. Wilson is not trying to retreat.  He is not shying away

21   from engagement with the officers.  He is aggressively

22   pursuing them.  And when he sort of gets pushed back after

23   trying to open the door, he goes back and picks up the PVC

24   pipe and strikes at one officer and sort of tosses it back

25   into the crowd.  And even after that, sort of mills around in

1    that area a little bit.  Not trying to get out.  That's

2    obvious from the video.

3          Let me go to the next.  So this is officer's body

4    worn camera, it's a pretty short clip.  It shows Mr. Wilson

5    sort of attacking, pushing one of the officers here.  And in

6    about three seconds, you will see Mr. Wilson shove one of the

7    officers to the ground.

8          (Video shown)

9          MR. TORTORICE:  This is essentially a longer -- the

10   one we just saw is from the perspective of one of the

11   officers from his body worn camera.  This is from the

12   perspective from the crowd.  It is a little bit of a longer

13   video.  But what you will see in the beginning part is you

14   will hear someone yell to take one of the officer's shield.

15   Then Mr. Wilson and I think two other people attempted to

16   take the shield.  It is a little difficult to see just

17   because the angle is cut off but that's what it appears.

18         Then at 24 seconds, you will see the officer sort of

19   fall backwards from the push of the crowd.  And they lower

20   the shields as they were kind of falling back.  That creates

21   an opening for Mr. Wilson, which is what you just saw from

22   the previous video from the officer's body worn camera.  So

23   you kind of get that part of it from both perspectives.

24         (Video resumed)

25         MR. TORTORICE:  All right.  This is our last video,

1    Your Honor.  This is a different view, I'm sorry, this is the

2    next to the last video.

3           So you will see in this video is Mr. Wilson sort of

4    pushing against the crowd, the officers, the shield, while he

5    is getting sprayed with O.C. spray, just to kind of show that

6    he wasn't easily deterred.  He was definitely determined to

7    get past the officers.

8           (Video shown)

9           MR. TORTORICE:  And this is last video.  It's a

10   totally different angle from a person recording in the lower

11   west terrace of Mr. Wilson, you can see him pick up the PVC

12   pipe, and sort of bend down, then jab at the officers with

13   the PVC pipe.  And then, as he is walking away, just tosses

14   it back at the line of officers.

15          One of the times he jabbed is when it struck Sgt.

16   Gonell, who would like to speak, give a victim impact

17   statement at the end of this hearing.

18          (Video resumed)

19          THE COURT:  That was the defendant very visible

20   right there, who tossed it then.

21          MR. TORTORICE:  Yes, Your Honor.  He did tossed it

22   right there.

23          THE COURT:  He has the pepper spray all over his

24   face there.

25          MR. TORTORICE:  Yes, Your Honor.  He has already

1   been sprayed by the officers and is apparently still engaging

2   them in this way.

3         THE COURT:  I don't understand why the defendant --

4   -- I saw these tapes last night, they were Defendant's

5   Exhibits.  I wanted to be sure to see them before the

6   sentencing.  And I don't understand why the defense would

7   have even sent me these tapes to review last night.  They're

8   not to the defense's advantage.  It looks like the tapes the

9   government would show me for an upward departure, not the

10  defendant giving them to me for a downward variance.  I don't

11  understand the defendant's theory.

12        MR. TORTORICE:  Your Honor, we filed these yesterday

13  as well.

14        THE COURT:  I think they're the same thing that the

15  defendant provided first from what I saw anyway.  They are

16  what I saw.  And it was clear to me that the defendant was

17  shoving his way forward.  He wasn't being pushed forward.  He

18  was shoving his own way forward.

19        MR. TORTORICE:  So Your Honor, that's essentially

20  the summation of our argument as to why the defendant's

21  motion for variance should be denied and the Court should

22  sentence Mr. Wilson, the government is requesting 46 months

23  but certainly not a variance or departure.

24        THE COURT:  All right.

25        I'll be glad to hear from the officer as well.

1          MR. TORTORICE:  William, would you like to, just

2     timing-wise, would you like to do that now?

3          THE VICTIM:  Sure.

4          MR. TORTORICE:  I have to try to figure out how to

5     stop showing my screen.

6          THE COURT:  I'm not cutting you off if you want to

7     show more.

8          MR. TORTORICE:  No, Judge, that's the end of the

9     videos that we had.  One other issue before I forget and move

10    on, as it relates to the matter of restitution, the

11    government brought this up in its memo.  So at the time of

12    the plea, we weren't aware of some of -- all of the issues

13    with, particularly with Sgt. Gonell's injuries.

14         We're asking the Court to sever the issue of

15    restitution for Sgt. Gonell.  I think we have 90 days to take

16    that up.  And we're asking the Court to do that.  Part of the

17    reason is, as the Court, I know, has seen probably these

18    videos on numerous occasions, causation is a difficult issue

19    since there are so many people engaging these officers.  And

20    some of these injuries are sort of repeated use type of

21    injuries.  So they're really hard to attribute solely to one

22    defendant.  But lots of people were involved.  So we wanted

23    to ask the Court to allow us to kind of take a leap on that,

24    just that one particular issue, and address that when we

25    think we have more information.

1          And on top of that, some of Sgt. Gonell's injuries,

2     the treatment for his injuries are ongoing, and there may be

3     additional surgeries he needs.  So those are still kind of

4     in-the-air issues.

5          THE COURT:  All right.

6          MR. TORTORICE:  So would the Court prefer to hear

7     from Sgt. Gonell now?

8          THE COURT:  Yes, now is fine.  That way, the

9     defendant's counsel also has an opportunity to speak to that.

10          VICTIM IMPACT STATEMENT OF SGT. AQUILLINO GONELL

11          THE VICTIM:  Good afternoon, Judge Lamberth.  How

12     are you?  Thank you for having me and I will read my

13     statement now.  I appreciate the opportunity to appear at

14     this proceeding today to speak.  I submitted a more formal

15     statement and I would just summarize what I wrote.

16          I was born in the Dominican Republic as a boy raised

17     with American values learned from an American philanthropist,

18     missionary teacher who was teaching English in my town.  I

19     was so impressed that I joined the Army when I was 21 years

20     old several years after I arrived here.

21          Later on, I deployed to Iraq during the Iraq war.  I

22     was used to fighting against enemy of the United States.  I

23     never encountered what I witnessed on January 6.  On January

24     6, 2021, I was working as a sergeant on the Civil Disturbance

25     Unit of the United States Capitol Police as we struggled to

1    restore order after being attacked by a mob of

2    insurrectionists which included Mr. Wilson.

3          While located on the lower west terrace entrance, I

4    defended myself and my fellow officers in the United States

5    Capitol from Mr. Wilson.  He attempted to gain entrance into

6    the U.S. Capitol building as part of his effort to stop the

7    steal, to overthrow the government in a coup, and subvert the

8    democratic process by stopping the certification of the 2020

9    presidential election results.

10          I distinctly remember Mr. Wilson because he was

11   wearing a white hat, white and purple hat with the words

12   "Fake CNN News" on it, as well as a black jacket.  I

13   literally remember being face to face with Mr. Wilson as he

14   led the crowd of insurrectionists and pushed me to gain

15   entry.

16          He also used a pipe that you saw on TV, on your

17   video and I blocked it.  The officer behind me or next to me

18   did not have a helmet.  And I prevented that hit, that

19   officer from being hit with a pipe that he used as a weapon.

20          Both my hands were bleeding by that time from

21   blocking and throwing from his blows.  Although Mr. Wilson's

22   black jacket was soaked with pepper stray that he received on

23   several occasions, he insisted on continuing to fight me to

24   prevent me, us, from closing that door that would enable him

25   and his fellow insurrectionists to advance through the tunnel

1    in the Capitol.  Members of Congress and Senate were being

2    evacuated through the same very route.

3         I remember seeing Mr. Wilson pick up flag poles from

4    the floor and then use them as a weapon.  In Mr. Wilson's

5    final moments in front of me, he used his fist and viciously

6    threw several punches and then used his body to push through

7    the police line as well.  Mr. Wilson did not listen to my

8    lawful commands to discontinue his violent action.

9         As I speak today, I do not believe his fake sense of

10   remorse.  It is my belief that if Mr. Wilson hears the same

11   cry that he heard on that day in the rally, he would try to

12   converge on the Capitol in the future and do the same thing.

13   He will not hesitate.  He will assault me and my fellow

14   officers again and again, just like he did on that day, when

15   we were protecting the public, the members of Congress and

16   our democracy.

17        As a result of his actions, I have not been able to

18   have a normal day with my family at home or at work since

19   January 6.  I sustained multiple injuries including

20   contusion, lacerations on both hands, contusions on my left

21   calf, a bone fusion surgery on my right foot; on my left

22   shoulder, I received a labrum tear and rotator cuff surgery

23   which I'm still recovering from those injuries.

24        I have been attending mental health sessions twice,

25   every other week just to cope with the trauma that I went

through that day.  More than one year later, I still have not
been able to put on my police uniform due to those injuries
because of what he did to me and my fellow officers.  I
continue to be assigned to light duty and have been placed on
various types of leave, which has greatly affected by wages.

Those who attacked the Capitol as insurrectionists
should be punished.  They seem to think it was acceptable
conduct for them to have done what they did.  This was not a
peaceful protest, nor was it an exercise of legitimate
political discourse.

My faith in the political and judicial system that
support this great country has been shaken and I hope a
strong sentence imposed on Mr. Wilson will help restore it in
our democracy.

That is my statement.  But I do not believe that
Mr. Wilson was trying to retreat that day.  He continued
pushing forward himself, without nobody else pushing him,
even though he was sprayed several times in his face.  I
remember vividly what happened that day to me, to him, and
his intent was clear to me, which was to go through that
tunnel, go through the entrance by all means.

Thank you for listening to me and I hope this serves
as an example for other people, that I'm really, really
outraged about some of these sentences that, in a way, the
lack of accountability, 35 days or 45 days.  I know I'm not

1   making the decision.  But for the violence that I witnessed

2   that day and what I have been through, they have not only

3   affected myself, but my family in every way.

4          As a matter of fact, once I finish this, I have to

5   go to physical therapy because of that day.  Every single day

6   I'm reminded of that day and Mr. Wilson was part of that day.

7   Thank you.

8          THE COURT:  The 30 and 45 days have not been for

9   anyone who assaulted an officer.  I assure you.

10          THE VICTIM:  Thank you.

11          THE COURT:  They have been for people who committed

12   other violations but they have not been assaults.  The

13   assaults on officers have been dealt with in a better fashion

14   than that, I assure you, including by me.

15          THE VICTIM:  Thank you, Your Honor.  I appreciate

16   that.

17          THE COURT:  Thank you for coming forward and

18   speaking, Sgt. Gonell.  It is helpful to the Court to have

19   your perspective.

20          All right.  Mr. Peterson, you have your job cut out

21   for you obviously.  I would certainly be glad to hear what

22   you've got to say.

23          MR. PETERSON:  Let me start with a good question

24   that you asked, which is why in the world did the defense put

25   these videos in.  It's because I know the government is

 1      putting the same videos in.

 2              THE COURT:  Exactly.

 3              MR. PETERSON:  I wanted to talk about those videos

 4      in my sentencing memorandum.  First of all, let me go back

 5      just quickly to the idea that he stops anybody from closing

 6      the door.

 7              At the very end of the government's video, you see

 8      that door and it's included in my sentencing memorandum.

 9      That door that he is I guess attempting to stop from being

10      closed is broken entirely.  The glass is all broken out.  So

11      nobody is going to stop going through just because that door

12      closes or doesn't close.  If it is closed, they're going to

13      go through the window that has been broken out.

14              And second, you know, part of this frankly is just

15      requires I think that both myself and Duke are honest with

16      you about what is going on.  As I said, the government in the

17      memo, the government says he's moving forward.  I see

18      portions in those videos, as likely you do, too, I watched

19      them.  I've watched the same videos too many times but it

20      looks like on occasion, for example, the thing with Sgt.

21      Gonell, I think is the video where he has fallen in, or is

22      rushed in.  There was a woman at the side of him.  And it

23      looks to me like he falls in.  The video from the other angle

24      that the government shows today does look like he is moving

25      in.  Either way, does not excuse his behavior.  I'm not

1   suggesting it does.

2          A reasonable person under those circumstances

3   doesn't go in the tunnel.  A person who stops and thinks that

4   he is in the tunnel and hearing the chaos that's going on in

5   there.  When we play it with you in this setting, you don't

6   really hear the screaming but you play the videos, you hear

7   the screaming.

8          THE COURT:  I did.  And I don't understand why he

9   didn't get the hell out of there.

10          MR. PETERSON:  Exactly.  Exactly.  That is what I

11   was going to say.  I was going to say the same thing.  He

12   will tell you he should have gotten the hell out of there.

13   There is no doubt about it.  So I can't pretend it's all rosy

14   here, it is not.

15          THE COURT:  Right, right.

16          MR. PETERSON:  But the reality is, I just would

17   argue to the Court that, in view of the other factors in this

18   case, this is not to minimize what Sgt. Gonell went through,

19   I don't want to minimize that at all.  Like him, I've served

20   in the military, I'm a supporter of law and order.  That is

21   not the point.  The point is just frankly, that this is a

22   crowd that got riled up, he succumbed to that.  He was in a

23   place where he shouldn't have been.  As he said, he was

24   stupid.  I don't know if I can tell you more than that.  But

25   I set out some reasons why I felt the downward departure from

1   the guideline range--

2            THE COURT:  That is what makes these hard cases.

3            MR. PETERSON:  I agree with you.  I won't go through

4   them, they're set in page nine in my memo.  You either buy

5   them or you don't.  That's the way life is.  We get that

6   completely.

7            I appreciate you taking the time.  I admire the

8   notion that you are willing to stand up and say basically,

9   listen, defense lawyer, why in the world did you send me

10  those videos.  I got a pretty good chuckle on it when you

11  did.  But I also knew that you knew why I sent those videos

12  because you knew that I knew regardless, they're mine, I'd

13  better embrace them at some level and tell you that we have

14  some explanation for them.

15           THE COURT:  I also knew you are not some cause

16  lawyer, you're a public defender who knows what you're doing.

17  So I knew that there is a rationale that goes with it.

18           MR. PETERSON:  Well, thank you.  I appreciate that.

19  I do appreciate your attention in this case. I know this is a

20  serious case.  I understand all too well what happened here.

21           Like everybody else, I watched it from my office on

22  T.V.  Frankly, I couldn't figure it out.  But in reflection,

23  this is another one of those examples that the crowd, the

24  dynamics in crowds is so strange.  There is project now that

25  looks at crowds, a guy is putting a book together about

crowds who attended public lynchings in the '30s and '40s.
You see those photos.  It is like they have all come out of
church, half of them have suits and ties on, and it's little
kids, adults.

I ask myself, how does this happen.  I think that
there are things about crowds that psychologists probably
understand better than I do.  But there's this amazing
dynamic that is so negative.  I apologize for taking too much
of your time.  I certainly know that my client wants to talk
to you.  Thank you.

THE COURT:  Sure.  Sure.

All right.  Mr. Wilson, I know you would be nervous
at a time like this.  But I am certainly interested in
anything you would like to say.

THE DEFENDANT:  This wasn't the first presidential
or president I went to see.  When I was in grade school, I
went to see President Kennedy in Oregon.  And I cherished
being able to shake his hand.  I was up to the fence and I
got to shake his hand.  Then when he got killed, I was very
sad.

But when I went to this rally, I was working in
Eaton, Oklahoma, the first one I went to, and at an oil
pipeline.  They had a rally in Tulsa, Oklahoma.  I just went
to it.  And just wanted to go and see what was said.  Then I
retired, mostly retired, and went to the home, just start

1    working, somebody they said they were going to have a rally

2    December 12, 2021.

3            I had not been to Washington, D.C. to see any, I had

4    never been there before and I wanted to see the historical

5    sites.  I went there, attended the rally.  There was no

6    candidates there, just speakers.  I got to see some of the

7    sites, but the rest were closed down because of the pandemic.

8    Then went home.

9            Later on, they said there was going to be a January

10   6th rally to protest the election, or that was part of it.

11   We just went to, me and my boy, to see what they said and

12   there was no plan to do anything.  Just see what they said.

13           When I got there, I was kind of disappointed because

14   I watched on my iPad where the -- before the election run-off

15   in Georgia, he spoke.  And it seemed like word for word

16   almost the same speech.  So I was kind of disappointed.

17           Then they said everybody is going to go up to the

18   Capitol, and left there, followed crowds, went up there.  All

19   of a sudden (inaudible) to the right, my Achilles tendon

20   killing me.  I take a picture of the people behind me.  I

21   felt pride in there, there were lots of people with flags.

22           I was trying to get to the other side and I see lots

23   of people ahead of me.  And then I'm inside and I see people

24   off to my right, shooting tear gas or squirting, I guess it

25   was not tear gas but pepper spray.  And I hear like taser

1    guns.

2            I said this is not a good spot but I was already in

3    there.  Then somebody really clubbed me and tried to take my

4    iPad and my wallet that I had in my right hand.  And I was

5    able to keep it.  After that, they say that I should remember

6    that, but I don't, what I did.  I looked at some of the

7    videos and that was, that was stupid for me to do something

8    like that.

9            Anyway, towards the last, somebody shoved me into

10   two officers.  And I was able to tell them I cannot do

11   anything, my legs are like jello, people are shoving behind.

12   And somebody started beating me on the head.  I said who is

13   doing that, is it me or the people behind me.  But anyway,

14   they got me in the face with the pepper spray and then I

15   couldn't see.

16           Anyway, I made my way out.  Got some people put like

17   milk or water in my eyes so I could finally get to see a

18   little bit.  And there were people breaking windows.  I

19   caught up with my boy.  He said he got trampled, he is

20   crippled.  And they tried to stop some of them, the people

21   from busting the windows on the outside.  And they wouldn't

22   do it.  The next thing I know, it's people spraying tear gas

23   in at the officers and then turning around and spraying in

24   the crowd.  I just thought this is something really weird

25   here.

1          Then there was big bangs and tear gas I guess it was

2    because you couldn't breathe.  And we headed home, or gotten

3    out of there up to the right of basically the tunnel.  I

4    remember seeing going by like an office trailer, some people

5    looking at film or something.  And got an Uber driver, went

6    back to the hotel, I just remember taking a shower and

7    (inaudible) over my head.

8          Then a few weeks after that, somebody called me and

9    said they seen my picture.  So that's when I came to Boise

10   and tried to, I said that's my picture.  They called the

11   Federal Defenders office.  They said just wait until we call

12   you.  There is nobody after you.

13         Next thing I know, somebody at the FBI called me and

14   said, come turn yourself in.  So I drove to turn myself in.

15   I made a very bad decision by going in that place that day.

16   It is not me, what they said what I am, what they make me out

17   to be.  I'm not that kind of person.  I'm retired, I wanted

18   to work on my boy's place and be with my cow dog, take care

19   of him.  I'm sorry, I am very sorry I caused injury to the

20   officers.  And I made a very bad decision.

21         I was taught to take responsibility for my actions

22   ever since I was young.  So I deserve punishment.  I guess

23   I'm nervous, but I didn't have a plan.  There was no plan to

24   do all of this.  I wasn't trying to hide anything when I

25   walked in there.  But some of the videos that they showed me,

1  I just can't believe that I was doing that.  I think that

2  because of that one blow on the head where they said I needed

3  stitches, I never did, but I think I was just kind of walking

4  around in a daze I think.  I don't know.  But I don't even

5  remember walking into the tunnel.  That's about all I have to

6  say, Your Honor.

7       THE COURT:  Okay.  Well thank you, Mr. Wilson.  I

8  think that's what makes this a difficult case for the Court

9  because you know, obviously you are a descent guy, you've

10  lived a good life, you've lived a productive life.  You have

11  been an upstanding citizen all your life.  You have these

12  character references that are terrific.  You come from a good

13  background.  You made a terrible mistake.  You've tried to

14  fess up to it as best you could.

15       But that was a horrible day for our country.  It is

16  a horrible day for the Court to witness those videos and to

17  see what happened to our country that day and it's a message

18  that the Court has to send that our country cannot deal with

19  that, to accept within the confines of what we have within

20  the law, under the law, I do reject the idea that there could

21  be a downward departure.

22       I do sentence you in accordance with the guidelines

23  and Sentencing Reform Act of 1984 in consideration of the

24  factors under 18 USC Section 3553, it is the judgment of the

25  Court that you are hereby committed to the custody of the

1    Bureau of Prisons for concurrent sentence of 51 months on

2    counts 3 and 7; you are further sentenced to serve concurrent

3    terms of 36 months of supervised release on counts 3 and 7.

4    And in addition, you are required to pay special assessment

5    of $100 on each count, required to be imposed, special

6    assessment for a total of $200.

7         The Court will not impose financial penalty of a

8    fine but will impose the $2,000 special assessment as to the

9    Architect of the Capitol, that you have already agreed to.

10   We'll defer any other restitution obligation for 90 days and

11   give the opportunity to the United States to see whether the

12   restitution provision might be appropriate.

13        While on supervised release, you shall abide by the

14   following mandatory conditions as well as standard conditions

15   of supervision which are imposed to establish the basic

16   expectations of your conduct while on supervision.  But

17   mandatory conditions include:

18        One, you should not commit a federal, state or local

19   crime.  Two, you must not unlawfully possess a controlled

20   substance.  Three, the mandatory drug testing condition is

21   suspended based on my determination that you pose a low risk

22   of future substance abuse.  Four, you must cooperate in the

23   collection of DNA as directed by the Probation Office.  Five,

24   you must make restitution in accordance with 18 USC Section

25   3663 and 3663(a) or any other statute authorizing the

1    sentence restitution.

2          The following special conditions:  You must pay the

3    financial penalty in accordance with the schedule of payments

4    and you must provide the probation access to your financial

5    information and authorize the release of financial

6    information until the restitution has been paid.  The details

7    on the restitution to the Architect of the Capitol will be

8    included in one of the final restitution obligations as

9    settled in 90 days.

10          Probation office shall release the presentence

11    investigation report to all appropriate agencies, including

12    the probation office in the approved district of residence in

13    order to execute the sentence of the Court,  treatment

14    agencies shall return presentence reports to the probation

15    office upon the defendant's completion or termination from

16    any treatment.

17          You have a right to appeal the sentence imposed if

18    the period -- under certain conditions, if you choose to

19    appeal, you must file your appeal within 14 days after

20    judgment.  Under 28 USC 2255, you may have the right to

21    challenge the conviction entered or the sentence imposed if

22    new or currently unavailable information becomes available to

23    you or on the claim you've received ineffective assistance of

24    counsel in entering a plea of guilty or in connection with

25    your sentencing.

1          If you are unable to afford the cost of appeal, you

2     may request permission from the Court to file an appeal at no

3     cost to you pursuant to the D.C. Circuit opinion in U.S. v.

4     Hunter.

5          Does counsel for either side have any objection to

6     the sentence imposed that has not already been noted on the

7     record?

8          Mr. Peterson?

9          MR. PETERSON:  No, Your Honor.

10         THE COURT:  The government?

11         MR. TORTORICE:  None from the government, Your

12    Honor.

13         THE COURT:  Okay.  The defendant will be allowed to

14    self surrender at the date and time, after designation by the

15    Bureau of Prisons to serve out his sentence after selection

16    of the facility.

17         Mr. Peterson, did you have anything that you wanted

18    to have the Court recommend in terms of a place?

19         MR. PETERSON:  Yes, Your Honor.  Sheridan, Wyoming.

20    I mean Oregon, not Wyoming.

21         THE COURT:  Okay.  What is the one in --

22         MR. PETERSON:  No, I said Wyoming but--

23         THE COURT:  It's Oregon.

24         (The Court confers with the Courtroom Deputy.)

25         THE COURT:  I'm going to defer the whole restitution

1    question and enter a separate order on restitution.  So we

2    don't need to include that.

3              On the motion of United States, what are we --

4              MR. TORTORICE:  Your Honor, we would move to dismiss

5    the remaining counts in the indictment.  I believe he pled to

6    counts 3 and 7.

7              THE COURT:  Remaining counts will be dismissed on

8    the motion of the United States.

9              All right.

10             Anything else, Mr. Peterson?

11             MR. PETERSON:  No, sir.

12             THE COURT:  Okay.  The government?

13             MR. TORTORICE:  Nothing from the government, Your

14   Honor.

15             THE COURT:  Okay.  All right.

16             Good luck, Mr. Wilson.

17             The Court will be in recess.

18             (Whereupon, at 3:02 p.m., the hearing concluded.)

19

20

21

22

23

24

25

1           CERTIFICATE OF REPORTER

2                     I, Lisa Walker Griffith, certify that

3    the foregoing is a correct transcript from the record of

4    the remotely reported proceedings in the above-entitled

5    matter.

6                     Please Note: This hearing was held in

7    compliance with the COVID-19 pandemic and the standing orders

8    of this court, and is therefore subject to the

9    technological limitations of court reporting remotely,

10   including static, signal interference and other restrictions.

11

12

13

14   _____   3-18-2022
     Lisa Walker Griffith, RPR           Date
15

16

17

18

19

20

21

22

23

24

25